**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-228 (JDB)** |
| **v.** | : | |
| | : | |
| **THADDIS JOHNSON, JR.,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Thaddis Johnson, Jr. to a split sentence of 45 days of incarceration to be followed by three years of probation, sixty hours of community service, and $500 in restitution.

**I.     Introduction**

Defendant Thaddis Johnson, Jr., a 31-year-old from Lemoore, California, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Johnson pleaded guilty to one count of violating 18 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Johnson: (1)

---

[1] Although the Statement of Offense in this matter, filed on August 10, 2022, (ECF No. 21 at ¶ 2) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

entered the Capitol building on three separate occasions; (2) filmed as other rioters engaged in a physical struggle with police to breach these barriers; (3), entered the Parlimentarian's Office while it was being ransacked; (4) entered the Senate Wing Door through a broken window; and (5) misrepresented his conduct on January 6th and his presence at the Capitol during multiple interviews with the FBI.

On January 6, Johnson watched the President's speech and then was part of the crowd that walked toward the Capitol. Johnson entered the restricted perimeter and observed people breaking windows with flag poles. He could also see people pushing against what he believed were police shields and saw several people climbing up scaffolding and becoming aggressive. Johnson also saw the police retreating after a large group of people breached a door on the northwest terrace. Johnson entered the Capitol though the Northwest Side Door shortly after its breach, stayed in the building for less than one minute, and left.  He then re-entered the same door, went directly into the Senate Parliamentarian's Office, and stayed for another few minutes.  Johnson then exited and went to the Senate Wing Door, where he was present while rioters fought with police and breached the door for the second time.  After exiting the building a second time, he jumped through a window adjacent to that door to enter the building a third time, stayed in the hallway for approximately five minutes, and then left for the third and final time.

The Court must also consider that Johnson's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. As this Court stated in *United States v. Thomas Fee*, "[t]he defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an

important democratic processes of this country." 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17.  It cannot, and should not, "pull this misdemeanor out of that context." *Id*. Johnson's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Johnson's crime support a sentence of incarceration followed by a three-year term of probation.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

*Defendant Johnson's Role in the January 6, 2021 Attack on the Capitol*

In the leadup to January 6, 2021, Johnson became involved in the QAnon movement as well as the Digital Army, and started a group called "Save Our Children."  He posted photographs on Twitter of himself at various rallies, see Images 1 and 4, below, as well as photos of himself with other people who would later be charged as Capitol Breach defendants, as seen in Images 2 and 3, below:

 

Johnson and Enrique Tarrio (D.D.C. 21-cr-175)

Image 1                               Image 2



Johnson and Simone Gold (D.D.C. 21-cr-85)

Image 3



Image 4

Johnson also ran a YouTube channel titled "Real Important News" where he would upload videos of himself at political rallies and discussing his political beliefs. *See* Image 5, below.



Image 5

Screen shot from https://www.youtube.com/watch?v=s-imUQ61Ok8

On January 5, 2021, Johnson took an overnight flight from California and arrived in Washington, D.C. at approximately 9:30 a.m. on January 6. He went straight to Donald Trump's speech and recorded a "selfie" video of himself listening to the President's speech. *See* Image 6,

5

below. In the video, Johnson can be heard saying, "we out here, man, D.C., Stop the Steal, we out

here five million strong."



Image 6

Screen shot from video attached as Government's Exhibit 1

Following the speech, Johnson traveled to the Capitol and entered the restricted perimeter.

Johnson stopped to take a photograph with another infamous rioter and Capitol Breach defendant,

Jacob Chansley (D.D.C. 20-cr-003), which Johnson posted to his Facebook page,  Image 7 below:



Image 7

An open-source video captured Johnson within the restricted area on Capitol grounds on the Northwest Terrace, Image 8, below.



Image 8

Screen shot from https://www.youtube.com/watch?v=k1_pp8_lb_o&t=4740s at 1:18:59

Johnson made his way toward the rioters attempting to breach the Senate Wing Doors and Northwest Side Door, which was adjacent to the Senate Parlimentarian's Office. Johnson observed an individual breaching the Northwest Side Door by repeatedly swinging either a cane

or crowbar.  In Image 9, below, Johnson, circled in red, is watching this individual break down the door.



Image 9

*See* Government's Exhibit 2 at 0:11; *see also* Government's Exhibit 3-4

Image 10, below, shows the location of the Northwest Side Door.



Image 10

Rioters breached the Northwest Side Door at 2:42 p.m.   *See* Image 11 below. Thirty six seconds later, Johnson was captured on open-source materials and closed circuit television

(CCTV) entering the Capitol though the broken door as he appeared to be recording video on this mobile telephone while police retreated from their position. *See* Image 12, below.[2]



Image 11



Image 12

---

[2] As discussed below, Johnson consented to the FBI downloading his phone. This image or video, if one was taken, was not recovered.

Johnson stayed in the hallway for approximately thirty-eight seconds and then exited. Approximately three minutes later, Johnson re-entered the building through the same doors and went directly into the Senate Parliamentarian's Office, where he was captured in an image taken by another rioter and Capitol Breach defendant, Jason Riddle (D.D.C. 21-cr-304). *See* Images 13 and 14, below.



Image 13



Image 14

*See U.S. v. Jason Riddle*, Case No. 21-cr-304, ECF No. 31, at 8

Johnson remained in the Parlimentarian's Office for approximately seventy seconds as it was being ransacked, then went across the hall, *see* Image 15, below, in an area housing offices and meeting rooms, where he remained for approximately one minute. Johnson left the building for the second time at 2:49 p.m.



Image 15

Johnson then made his way across the courtyard on the northwest side of the Upper Terrace and went to the Senate Wing Door, which had been breached for a second time at 2:47 p.m. There, open-source video and Johnson's own video show him entering the Capitol Building for a third time as a member of the mob. *See* Exhibits 16 and 17, below.



Image 16

Screen shot from government's Exhibit 5 at 0:02



Image 17

At 2:51 p.m., approximately four minutes after the mob attacked police officers and breached the Senate Wing Door for the second time, Johnson entered the Capitol a third time by climbing through a broken window. *See* Image 18, below.



Image 18

Johnson remained in that hallway for approximately five minutes before exiting through another broken window at 2:56 p.m. *See* Image 19, below.



Image 19

13

Johnson would not re-enter the Capitol, but he did not immediately leave.  Following his exit, Johnson recorded another selfie of himself on the Northwest Terrace with the mob, Image 19, below.



Image 20

Johnson also traveled to the East Front of the Capitol, where he had someone take a photograph with Johnson's phone as he posed in front of rioters standing on police vehicles, Image 21, below.



Image 21

*Johnson's Interviews with the FBI*

On January 26, 2021, Johnson gave a voluntary non-custodial interview to the FBI at his home in California. During the interview, Johnson admitted to traveling to Washington, D.C. by himself because he was requested to be there by the President and wanted to document the event. Johnson admitted to being on the steps of the Capitol recording the crowd but claimed to not observe any Capitol Police or barricades at the time. He stated that he did observe people breaking windows with flag poles, and in the distance could see people pushing past what he believed were police shields. Johnson stated that his phone battery was dying and was also worried for his own safety, so he left the Capitol grounds and walked to a nearby convenience store to find a phone charger. He stated that he later observed lines of police and military protecting the building.

After law enforcement officials determined that Johnson had entered the Capitol building, the FBI interviewed Johnson a second time on May 23, 2022, in California. At that time, law enforcement officials were aware only that Johnson had entered the Northwest Door and were

unaware Johnson had entered a third time through the window next to the Senate Wing Door. During this interview, Johnson again denied seeing any barricades around the Capitol, and stated that he was in a very large crowd that made it difficult to move. He stated that he felt like it was just people walking around as if they were on a tour. Johnson was presented with several photographs of him inside the building near the Northwest Side Door and the Senate Parliamentarian's Office. Johnson identified himself in those photographs. He stated that, after witnessing several others enter the door, he followed with the intention of observing and recording the events and denied assaulting anyone or taking any property. After exiting the Parliamentarian's Office, Johnson stated that he exited the Capitol building and proceeded to the north, then east side of the building where he stated he observed several people who were pepper sprayed.

Following the May 2022 interview, Johnson consented to agents searching his phone and showed them four of the videos he took that day. Johnson stated that he did delete "a few" videos, but only did so because the quality was poor and he was having issues with this phone.

*The Charges and Plea Agreement*

On May 23, 2021, the United States charged Johnson by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). Johnson was notified by the FBI of his arrest warrant, and on May 26, 2022, Johnson turned himself in and made his initial appearance in Fresno, California. On June 28, 2022, the United States charged Johnson by a four-count Information with violating 18 U.S.C. § 1752(a)(1) (Count 1), 18 U.S.C. § 1752(a)(2) (Count 2), 40 U.S.C. § 5104(e)(2)(D) (Count 3), and 40 U.S.C. § 5104(e)(2)(G) (Count 4). On August 10, 2022, pursuant to a plea agreement, Johnson pleaded guilty to Count Four of the Information. By plea agreement, Johnson agreed to pay $500 in restitution to the Architect of the Capitol

### III.     Statutory Penalties

Johnson now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Johnson faces up to six months of imprisonment and a fine of up to $5,000. Johnson must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days incarceration and a three-year term of probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Johnson's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Johnson, the absence of violent or destructive acts is not a mitigating factor. Had Johnson engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Johnson's case is the nature by which Johnson entered the Capitol building. Johnson did not just enter, look around, and then leave. He did so on three separate occasions. Prior to entering the building, Johnson could see that the crowd was becoming violent, and that people were using items to break windows and engage in destructive behavior. Despite this, Johnson joined the rioters and entered the building shortly after a door was broken. He then re-entered and observed rioters destroying the Senate Parlimentarian's Office. Johnson then left a second time, went to the Senate Wing Door after it was violently breached for the second time, and entered the Capitol a third time by climbing through a window. He filmed the crowd outside the Senate Wing Door as rioters were engaged in a physical struggle with the police, and then took advantage of the violence in order to gain entry.

Johnson's statements to the FBI, while seemingly cooperative, also misrepresented the full scope of his conduct. During his first interview, Johnson never confessed to going into the building. Although he admitted to being on the Capitol grounds, Johnson claimed not to observe any Capitol Police or any barricades preventing him from being there. By Johnson's account, he stayed for a bit and then left.

Johnson continued to be deceitful during his second interview. He again denied seeing any barricades and implied that he only went into the building after being swept up by the crowd. Johnson admitted to entering the building when confronted with photographs, but despite being in a sensitive area of the building as it was being ransacked, claimed that it just looked like people

were on a tour. He then exited the building and traveled to the East Front, conveniently neglecting to mention that he also entered the Senate Wing Door hallway by jumping through a window.

Johnson also engaged in mitigating conduct which factors into the government's recommendation. Although not entirely honest, Johnson twice agreed to be interviewed by the FBI, consented to a search of his phone, and provided the FBI with the passcode. He stayed in the Capitol for a total of less than ten minutes and did not encourage others to commit acts of violence or property damage. Johnson was informed of the warrant for his arrest and promptly turned himself in at the arranged time. He also promptly admitted to his charged conduct and accepted the government's plea offer less than three months after his arrest.  Although all those factors are laudable, they do not justify a sentence below the government's recommendation.

Accordingly, the nature and the circumstances of this offense establish the clear need for a split sentence of 45 days of incarceration to be followed by three years of probation, sixty hours of community service, and $500 in restitution.

### B.  The History and Characteristics of Johnson

As set forth in the PSR, Thaddis Johnson, Jr.'s criminal history consists of a single misdemeanor conviction for Driving Under the Influence of Alcohol/Drugs. ECF 23 ¶ 23. Johnson received a sentence of one day of incarceration and a three-year term of probation, which was terminated early.  *Id.*  During the pendency of this case, Johnson received a traffic ticket and tested positive for using marijuana, resulting in the issuance of a Pretrial Violation report.  ECF 23 ¶ 7; *see* ECF No. 18.  Since then, Johnson appears to have been compliant with his release conditions. *Id.*

Johnson's employment record is spotty, but he has been employed for most of the past decade. His upbringing was seemingly devoid of any mental or physical abuse, drugs, or other

circumstances to be considered mitigating. Johnson's parents are both military veterans. He lives

with his parents, does not own a vehicle or any real property, and does not appear capable of paying

a fine in addition to his restitution obligation.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As

with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United

States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

don't think anyone should start off in these cases with any presumption of probation. I think the

presumption should be that these offenses were an attack on our democracy and that jail time is

usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every

case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-

CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that Johnson accepted responsibility quickly once he realized he was being charged.  However, his conduct on January 6, 2021 and his repeated entry into the Capitol despite observations of violence and destruction demonstrates a need for specific deterrence for this defendant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Johnson based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Johnson has pleaded guilty to Count Four of the Information, charging him with 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71

(ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previous case has the same combination of aggravating and mitigating factors, the government has often recommended, and judges have imposed, periods of incarceration where a defendant has entered the building more than once.  A person's decision to enter the Capitol, leave, and then re-enter the building shows a particular disregard for police.  Johnson was aware of vandalism, theft, and destruction taking place in the Parliamentarian's Office.  Despite this, he left the building and then entered a second location through a broken window.  His decision to jump through the window is indicative of Johnson's knowledge of the violence around him. Although he did not personally engage in violence, Johnson took advantage of the violence inflicted by the mob.  His presence in the Senate Wing Door hallway contributed to the police response and the disruption of Congress.

In *United States v. Nathan Entrekin*, D.D.C. 21-cr-686 (FYP), the defendant, similarly to Johnson, entered the Capitol multiple times (twice, in fact) despite being forced out the first time by police officers and after videotaping rioters looting the Senate Parliamentarian's office. Like Johnson, Entrekin took videos of himself in the Northwest Plaza, and had a minor criminal history. Johnson, like Entrekin, entered another office in addition to that of the Parliamentarian, specifically Senator Jeff Merkley's Office (S140).  Like Johnson, Entrekin pleaded guilty to a single violation of 40 U.S.C. § 5104(e)(2)(G), and Judge Pan sentenced him to a split sentence of 45 days' incarceration and 36 months' probation.

In *United States v. Dawn Bancroft*, D.D.C. 21-cr-271 (EGS), the defendant, similarly to Johnson, twice unlawfully entered into and remained inside of the Capitol. Like Johnson, Bancroft climbed into the Capitol Building through a broken-out window next to the Senate Wing Door. Similarly to Johnson, Bancroft left the Capitol Building after only fifteen seconds, but reentered just one minute later and remained inside the building for a short time (approximately one minute and twenty seconds), during which she filmed a video while inside. Like Johnson, Bancroft admittedly deleted video from her mobile telephone that was never recovered. Bancroft pleaded guilty to a single violation of 49 U.S.C. § 5104 (e)(2)(G) and Judge Sullivan imposed a split sentence of 60 days' incarceration and 36 months' probation.

In *United States v. Brian McCreary*, D.D.C. 21-cr-125, the defendant pleaded guilty to a single violation of 18 U.S.C. § 1752(a)(1), a first degree misdemeanor. Similarly to Johnson, after being forced out of the Capitol building by police following his initial breach, McCreary entered the building a second time. McCreary was inside the Capitol building longer than Johnson and took videos of rioters who harassed and chased police inside the building. But unlike Johnson, McCreary did not enter any sensitive locations. Chief Judge Howell sentenced McCreary to 42 days' incarceration, to be served intermittently, as a condition of 36 months' probation.

Johnson's decision to enter the Senate Parliamentarian's office following his first re-entry into the building is also an aggravating factor this Court should weigh heavily. A defendant's entry into a sensitive space, such as a private office, places them in a more serious category of offenders than defendants who remained in hallways or central, more public spaces. Johnson's decision to enter the Parliamentarian's Office and remain while it was being ransacked posed a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway. Although there is no evidence that Johnson participated in

26

the vandalism, his presence in a private area shows a lack of respect for the people who work in the Capitol and were greatly affected by the actions of the mob.  Johnson has contributed to their suffering.

In *U.S. v. John Juran*, 21-ct-419 (TFH), the defendant also witnessed clashes between the mob and police before entering the Capitol and the Parliamentarian's Office.  ECF No. 21 at 1.  Juran did not participate in violence, was in the Capitol less than a total of ten minutes and was in the Parliamentarian's Office for mere seconds.  *Id*. at 6.  The government recommended sixty days of home detention as part of a three-year term of probation.  *Id*. at 1.  Judge Hogan followed that recommendation.

In *U.S. v. Rebegila*, 1:21-cr-283 (APM), the government recommended a split sentence of sixty days incarceration followed by three years' probation for a defendant who entered the Parliamentarian's Office. ECF No. 41 at 11.  After seeing the destruction in the office, Rebegila continued press forward into the Capitol.  He continued to stay on the restricted grounds for nearly forty minutes after leaving the building and re-entered the building through the Senate Wing Door *Id*. at 14.  Unlike Johnson, the defendant spent several hours on the restricted grounds.  *Id*. at 17.  Judge Mehta ultimately sentenced Rebegila to thirty days of home detention and twenty-four months' probation.

The government acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator

Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB).]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

As nine judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1

(D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same); *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022).[4] This Court should follow suit and sentence Johnson to fourteen days of incarceration to be followed by three years of probation.

But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10).   Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98.   First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.   *Id.*   Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."   *Id.*

---

[4] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§  5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 45-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21cr278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21cr278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21cr125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21cr627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21cr620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21cr370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43 (same); *United States v. Cameron*, 22-cr17 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same); *United States v. Jeremiah Carollo*, 22cr44   (APM) (D.D.C. Sept. 13, 2022).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent

confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to Johnson to 45 days of incarceration to be followed by three years of probation, sixty hours of community service and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    Stephen J. Rancourt
Texas Bar No. 24079181
Assistant United States Attorney, Detailee
601 D Street, NW
Washington, D.C. 20530
(806) 472-7398
stephen.rancourt@usdoj.gov

## CERTIFICATE OF SERVICE

On this 7th day of December 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.


Stephen J. Rancourt
Assistant United States Attorney