UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff,*<br><br>v.<br><br>**THADDIS "TJ" JOHNSON JR.**<br><br>*Defendant.* | Case No. 1:22-cr-228 (JDB) |

## MEMORANDUM IN AID OF SENTENCING

On December 19, 2022, Thaddis "TJ" Johnson Jr. will appear before this Court for sentencing, having pled guilty plea to a violation of 40 U.S.C. § 5104(e)(2)(G), a Class B Misdemeanor, for his actions on January 6, 2021. Thaddis Johnson Jr., by and through his attorney, Assistant Federal Defender Griffin Estes, hereby submits this memorandum in aid of sentencing. Mr. Johnson is asking that the Court place him on a grant of probation, with a condition that he complete 40 hours of community service. The requested sentence is "sufficient, but not greater than necessary" to meet the objectives of 18 U.S.C. § 3553(a), and accounts for both the aggravating and mitigating circumstances of Mr. Johnson's conduct, his lack of a prior serious criminal record, as well as his employment and educational history.

**I - Procedural History**

On May 23, 2022, Mr. Johnson was charged by complaint with four counts related to his conduct at the Capitol on January 6, 2021. ECF Dckt. #1. On May 26, 2022, Mr. Johnson surrendered to the United States Marshalls in the Eastern District of California and promptly had an out-of-district initial appearance; he was released with pretrial conditions. *See United States v.*

1

*Johnson*, 1:22-mj-00080-SAB (E.D. Cal.) On June 9, 2022, Mr. Johnson made an initial appearance in the District of Columbia. An information was filed on June 28, 2022. ECF Dckt. # 15. The four count Information charged Mr. Johnson with; Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four). *Id*.

**II – Plea Agreement.**

On August 10, 2022, Mr. Johnson pled guilty pursuant to a plea agreement. ECF Dckt. # 20. He entered a plea to Count Four of the Information, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). *Id*. According to the plea agreement, the Government will dismiss the remaining charges. *Id*. Mr. Johnson remained out of custody pending sentencing. For his conduct, Mr. Johnson faces up to six months in jail and a fine of up to $5,000. 40 U.S.C. § 5109(b); 18 U.S.C. § 3571(b). A term of probation of up to five years may be ordered. 18 U.S.C. § 3561(c)(2). The advisory sentencing guidelines do not apply to a conviction for a Class B misdemeanor offense. U.S.S.G. § 1B1.9.

Mr. Johnson has one prior conviction from over a decade ago. *See* Presentence Investigation Report ('PSR'), ¶ 23. If the guidelines applied in this case, he would have a Criminal History Category of I. This is Mr. Johnson's second criminal conviction – his first in over a decade.

**III - Applicable Legal Principles.**

Pursuant to § 3553(a), a sentencing court must consider the nature of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, protect the public,

provide needed treatment, and avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, and provide restitution. 18 U.S.C. § 3553(a)(1)-(7). Indeed, the circumstances of this case along with Mr. Johnson's personal history, highlight the importance of the Court's role "to consider every convicted person as an Individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (internal quotations and citations omitted). Consideration of all the § 3553(a) factors supports a sentence of probation. Such a sentence serves the goals of sentencing as it holds Mr. Johnson accountable for his conduct, deters similar conduct, and provides him the opportunity for rehabilitation. It is a sentence "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

**IV – Thaddis Johnson's History and Characteristics Support a Grant of Probation.**

Mr. Johnson, a 31-year-old man with minimal criminal history, should be placed on a grant of probation. While the nature and circumstances of the January 6 events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of active incarceration. A probationary sentence would provide adequate deterrence to Mr. Johnson, avoid an unwarranted sentencing disparity among similarly-placed January 6 defendants, and protect Mr. Johnson's ability to provide timely restitution.

    a. *Childhood, Schooling and Employment.*

Mr. Johnson, or TJ, as he is known, is from a military family. He was born in the United Kingdom when his parents, Leila and Thaddis Johnson Sr., were stationed there. PSR, ¶ 30. Mr. Johnson's dad was in the Marines and his mother was in the Navy. *Id*. Mr. Johnson has two younger siblings, Sade and Christopher. PSR, ¶ 31.

When Mr. Johnson was a toddler, he and his family moved back to the United States, where they eventually settled in the Central Valley of California. PSR, ¶ 35. After leaving the military, both of his parents began careers in the California Department of Corrections. PSR, ¶ 30.  They worked at Avenal State Prison. *Id*. As an elementary student, Mr. Johnson went to Christian schools. PSR, ¶ 33. Mr. Johnson was a good student, and his faith has always been a significant motivator to him. Mr. Johnson continues to have a strong connection to his faith. As a young person, Mr. Johnson also a talented athlete. Mr. Johnson decided to go to a public high school so that he could pursue an athletic career. At Lemoore High School, Mr. Johnson played basketball, football and he ran track. *See* PSR, ¶ 32. Mr. Johnson was the captain of his high school basketball team. He later went to Fresno City College where he played basketball.

Further, Mr. Johnson is an industrious worker. Even while in high school, Mr. Johnson was gainfully employed. At 16, he got his first job working at a McDonalds. PSR, ¶ 49.  After leaving school, Mr. Johnson immediately got a job. He has maintained steady employment since he was 18 years old. After he left college, Mr. Johnson worked at Target for a year. PSR, ¶ 50. He left that job after receiving a $0.04 raise. After Target, Mr. Johnson began a string of sales and commission-based jobs. He first began working at Cutco, where he sold knives. PSR, ¶ 52. He excelled at Cutco and was a leader in their sales team. See Attachment A – Community Support Letters, p. 4-5. When Mr. Johnson was at Cutco, the company opened a regional office. He became an assistant manager, where he oversaw a large team of sales associates. *Id*. He was in charge of bringing on new hires. He had managerial role until he left in late 2012.

 Mr. Johnson has had many jobs and has succeeded in several sales related fields. He worked for a short period at Alorica. PSR, ¶ 53. Later, he sold life insurance. Mr. Johnson also worked as an assistant to a veterinarian. PSR, ¶ 54.  He moved to Alaska to work in a fish processing plant. PSR, ¶

4

55. He sold grills at a kiosk in a mall. PSR, ¶ 56. In 2015, Mr. Johnson also worked at a cell-phone store, a subsidiary to T-Mobile. PSR, ¶ 57. After, he was hired by a corporate T-Mobile store and continued to do sales. Mr. Johnson was successful selling cellphones. Mr. Johnson is currently employed with City of Fresno, Parks Department. In order to work for the Parks Department, Mr. Johnson obtained a first-aid certificate.

In 2019, Mr. Johnson decided to pursue one of his passions: music. Mr. Johnson has created religious music for the past 10 years. Attachment A, p. 2. Mr. Johnson left the Central Valley and moved to Las Vegas in order to attempt to make a career as a music producer. He continued to work side-jobs – as a custodian – while also spending as much time in the studio as he could. While living in Las Vegas, Mr. Johnson also worked for Post-mates and Instacart. Mr. Johnson was hoping to gain more influence in the music industry. Mr. Johnson was making faith-based music. However, once the pandemic began, he moved back to the Central Valley to be with his parents.

    b. *Internet Fame and Negative Online Influences.*

Once Mr. Johnson moved home he was subject to the restrictions associated with the pandemic. He experienced the same social isolation that we all did. Yet, he continued to work in the gig economy, at Instacart. Moreover, Mr. Johnson furthered his efforts to make get into the music industry by promoting his music online. *See e.g.*, PSR ¶ 37.

The events surrounding the murder of George Floyd presented a marked shift in Mr. Johnson's life and began his foray into political life. Mr. Johnson attended a Black Lives Matter protest in Fresno. Mr. Johnson was sympathetic to the cause of Black Lives Matter. PSR, ¶ 64. Mr. Johnson was also aware of that several Black Lives Matter protests had descended into violence, and he wanted to make sure that the Fresno protest remained peaceful to not detract from the message. The Fresno protest was organized by a NAACP chapter at Fresno State. Mr. Johnson connected with

5

the leaders of that NAACP chapter, and then later with leaders at the NAACP in Lemoore. *See* PSR, ¶ 64. Mr. Johnson learned that there was an upcoming Black Lives Matter protest in Lemoore. The Lemoore Police Department posted a warning on Facebook that a potentially violent protest could occur. In response, Mr. Johnson made a Facebook post in which he offered protestors free pizza in the hopes of keeping the protest good natured. He paid for three pizzas out of his own pocket, but was able to buy sixteen in total with the help of donations. When Mr. Johnson went to the protest, he gave out pizza. He also was filming the whole event and was on Facebook "live" – he was broadcasting, or livestreaming, the pizza giveaway at the protest. This generated a significant amount of attention. Mr. Johnson received more online engagement than ever before. He gained local notoriety.

After the Lemoore protest, he received messages asking him to help set up a Black Lives Matter march in Hanford. Mr. Johnson organized a Black Lives Matter rally in Hanford and he coordinated with the Hanford Police Department. Mr. Johnson was able to speak at the protest. A police officer spoke at the protest, and so did other local leaders. Again, Mr. Johnson's public profile began to rise. He was catapulted into a leadership role in large part due to his online activity.

Mr. Johnson's online presence gave him local fame. He began to be more politically involved. He began to attend city council meetings and considered running for elected office. He began starting online townhall style meetings. Those local meetings brought together teachers, politicians and community members in an effort to improve equity and accountability in his community. During this time, Mr. Johnson's Facebook presence continued to grow. He would go 'live' frequently, and he would show his community the interactions he was having with law enforcement and the community. Mr. Johnson would livestream protests and other matters because he saw himself as a vehicle for information related to the causes he cared about. His leadership role

was premised on his ability to show these interactions with his Facebook followers.

In late July 2020, Mr. Johnson saw a Facebook post that advertised a "Child Lives Matter" protest that was happening in Hollywood, California. When Mr. Johnson got there, he was struck by the amount of people who were in attendance. As he did on previous occasions, Mr. Johnson went 'live' – he was livestreaming the event. Mr. Johnson went viral for doing this. Over a million people were watching his Facebook video. Mr. Johnson noted that the Hollywood protest, ostensibly to protect children, was also dominated by supporters of then-President Donald Trump. He thought the crowd had great energy and was pushing a positive message.

After the event in Hollywood, people from all over the country to reach out to him. Mr. Johnson achieved an online fame unlike anything he had previously experienced. Although Mr. Johnson's online activism began in Black Lives Matter, he came to believe that the message was divisive. Mr. Johnson is heavily influenced by his religious convictions and strives for a unifying message. He sees himself as someone who brings people together. The "Child Lives Matter" slogan seemed much more innocent and something that more people could get behind without as much antagonism over the role of police and racial divisions. Mr. Johnson also was receiving significant engagement from the online community which sought to 'save the children.'

Lurking in the background of his newfound online community was something dark that he failed to truly grasp. "Child Lives Matter" was not apolitical like the slogan may imply. Protecting children is clearly a laudable goal. What Mr. Johnson failed to appreciate it how political organizing around that message was largely conspiratorial. The "Save the Children" effort emerged in early 2020 as a splinter movement from QAnon, the group of internet conspiracy theorists who believe without evidence that President Donald Trump is secretly fighting a network of celebrities and

government officials who are running a child trafficking ring.[1] While Mr. Johnson was not an enthusiastic follower of QAnon, he still thrived in the attention he was gaining from the online community that surrounds the conspiracy theory. His online influence exploded after the protest in Hollywood and his many followers were QAnon adherents. However, Mr. Johnson saw that there was a true concern for the safety of children, and he believed that was a noble cause to get behind.

Mr. Johnson's online feed quickly shifted from Black Lives Matter content to QAnon content. In addition to all his new Facebook followers, he started to receive more content associated with Donald Trump. The online spaces he inhabited promoted the idea that Donald Trump was the best candidate for stopping child sex-trafficking. Mr. Johnson's reality was warped by the online disinformation campaigns that peddled in lies surrounding the election and the Democratic Party. Mr. Johnson came to believe that President Trump was somehow uniquely situated to intervene in the world to prevent the harms his online community was focused on.

Later, like millions of Americans, he came to believe that the election was stolen, and that President Trump was the rightful winner. The idea that the 2020 election was not lawfully won by President Biden has been incredibly pervasive. Over half of the candidates in one political party in the 2022 midterms elections continue to espouse belief in the falsehood. Thousands of people were drawn to DC to protest the election certification. The President and his political proponents painted an apocalyptic vision of the country and fostered a deep sense of injustice regarding the outcome of the election which they routinely described as 'stolen.' Mr. Johnson was primed to believe these lies and was existing in a social space in which such beliefs were commonly held.

Mr. Johnson went to the Capitol with a familiar attitude and self-perception: while

---

[1] See e.g., Amanda Seitz, *QAnon's 'Save the Children' morphs into popular slogan,* AP News, October 28, 2020, https://apnews.com/article/election-2020-donald-trump-child-trafficking-illinois-morris-aab978bb7e9b89cd2cea151ca13421a0 (accessed November 8, 2022.)

participating, he wanted to document the rally for his throngs of Facebook followers. Like other people Mr. Johnson took photos and posted them on his Facebook account. He relished in the positivity of the initial speeches. Regrettably he followed the crowd to the Capitol steps and eventually made his way into the building. He regrets his conduct.

Mr. Johnson no longer engages with the online community that propelled him to the Capitol on January 6. He understands that he was subject to a misinformation campaign that led him into the Capitol building. His online presence is much smaller, and he no longer seeks to gain recognition from online political organizing. He never considered himself a QAnon supporter but sees how the followers of the conspiracy were interwoven into his online persona and fame.

    c.  *Community Support.*

Despite his conduct on January 6, Mr. Johnson has significant amounts of community support. First, Mr. Johnson has strong family ties. Since going to D.C., Mr. Johnson has become a father. Mr. Johnson now has 2 toddlers; this has shifted his perspective. PSR, ¶ 34. Mr. Johnson is the primary caretaker of his children. *Id*. Many people have come forward to show their support of Mr. Johnson. *See* Attachment A – Community Support Letters. Mr. Johnson is part of an online faith community in which he attempts to share positivity and bible verses. Mr. Johnson's faith is very important to him. Mr. Johnson shares his faith with other people and seeks to be a positive force in the world.

Mr. Johnson also has a good new job with the City of Fresno. Mr. Johnson is working in the Parks and Recreation division for the city. He does maintenance of community parks and facilitates community events. Mr. Johnson has a history of community service. He has given out food during thanksgiving. PSR, ¶ 64. He's helped in back-to-school drives. *Id*. Mr. Johnson cares for his community.

**V – The Offense Conduct**

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained $1.4 million in property damage. Several people lost their lives as a result of the incident. And because of the breach, the 2020 Presidential Electoral College count was delayed. All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost friends, and some lost confidence in the American political system's ability to defend against threats to the peaceful transfer of power. Mr. Johnson was a participant in this event.

Like many people, Mr. Johnson went to January 6 event because he came to believe a noxious lie: that the election was stolen. Mr. Johnson received this message online. There was a steady drumbeat of disinformation leading up to the riot. However, Mr. Johnson's conduct on January was comparatively mitigated. Mr. Johnson did not participate in any specific violent acts nor did he commit any acts of vandalism or destruction. He was not physically aggressive, he did not scream, yell or solicit others to participate in the events of January 6. *See* PSR, ¶ 15-17. Mr. Johnson's entries into the Capitol were incredibly brief. In the videos which depict him in the Capitol, he is not interacting with other people nor is he acting as a leader. Although Mr. Johnson was near one of the initial breaches of a Capitol door, he was not leading the mob into the building. He followed a set of rioters, then exited the building less than a minute later. He is seen in surveillance footage looking at his phone and attempting to take pictures. As the crowd swarms, he retreats, take stock of the situation, walks back towards the door he came in. He was initially in the building for less than a minute. He later re-entered the building and observed the rioters in the Senate Parliamentarian's office and an adjacent office. He again stayed for a brief time and did not

10

participate in any destructive acts, nor did he encourage others to do so. He is again seen looking at his phone. He does not appear excited or enthusiastic. He walked from the Parliamentarian's office to an office on the other side of the hallway and then exited the building for a second time. Thereafter he left the building and returned to the Upper West Terrace. Several minutes later he re-entered the building through the Senate Wing Door, which had also been breached. A large crowd had already assembled inside the hall just past the Senate Wing Door. Rioters were packed shoulder to shoulder. Riot police stood by as members of the crowd milled around. Mr. Johnson moved through the crowd for several minutes, never approaching the line of police who were standing there. He is not seen chanting. He is not encouraging others to act. He is a solitary figure, intermittently looking at his phone. Unlike others, he did not seek to get further into the Capitol building.

Additionally, Mr. Johnson did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner doors or windows of the U.S. Capitol. He did not damage or steal any property while inside, and at no time did he assault or threaten law enforcement. He never came face-to-face with law enforcement while inside the building.

Mr. Johnson did not immediately show contrition in his Facebook posts immediately after the event. He failed to understand the gravity of what occurred given his beliefs regarding the 'stolen election.' Mr. Johnson now realizes that January 6 was not a peaceful protest. He regrets his conduct that day and his defense of the rioters. Mr. Johnson has met with FBI agents on several occasions and admitted to his conduct in those meetings. Further, he has renounced his prior views.

**VI – Similar Cases**

Under 18 U.S.C. § 3553(a)(6), the court seeks "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Given the number of defendants charged with misdemeanor offenses arising from their entry into the Capitol

on January 6, there exists an ever-growing number of defendants whose conduct mirrors that of Mr. Johnson which the Court may use as a reference. The circumstances of each defendant, of course, are unique. But it is difficult to distinguish Mr. Johnson from other cases where no term of incarceration was imposed. There is little that materially distinguishes Mr. Johnson's conduct from those cases. Where sentences imposed for the same offense conduct have included terms of incarceration (including home confinement), the offense conduct usually involved factors not present in this case: defendants who came prepared for a violent confrontation, made aggravated social media posts, or obstructed the investigation, for example.

    Mr. Johnson's conduct falls toward the mitigated, low-end of the spectrum of individuals who have been prosecuted in the District Court. He is among those who unlawfully entered the Capitol, but did not engage in aggravating conduct while present at the Capitol; he merits the imposition of a term of probation along with restrictive mandatory and discretionary conditions, but not a term of incarceration At least 20 cases arising from the January 6 riot have resulted in straight probation.[2] Mr. Johnson's is most similarly situated to those defendants who were sentenced to terms of probation.

    A few cases in which other Capitol-breach defendants pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G) (like Mr. Johnson) provide helpful points of comparison to place Mr.

---

[2] *See United States v. Morgan-Lloyd*, 21-cr-00164 (sentenced to 36 months' probation); United States v. Ehrke, 21-cr-00097 (36 months' probation); *United States v. Hiles*, 21-cr-00155 (24 months' probation); *United States v. Doyle*, 21-cr-00324 (2 months' probation); *United States v. Rosa*, 21-cr-00068 (12 months' probation); *United States v. Gallagher*, 21-00041 (24 months' probation); *United States v. Vinson*, et al., 21-cr-0355 (5 years' probation for each); *United States v. Sanders*, 21-cr-00384 (36 months' probation); *United States v. Cordon*, 21-cr-00269 (2 months' probation); *United States v. Wilkerson*, 21-cr-00302 (36 months' probation); *United States v. Wrigley*, 21-cr-00042 (18 months' probation); *United States v. Parks*, 21-cr-00363 (24 months' probation); *United States v. Nelson*, et. al., 21-cr-00344 (24 months' probation each); *United States v. Mariotto*, 21-cr-00094 (36 months' probation); *United States v. Edwards*, 21-cr-00366 (12 months' probation), *United States v. Wangler et. al.*, 21-cr-00365 (24 months' probation for each); *United States v. Hatley*, 21-cr-0098 (36 months' probation)

Johnson's own conduct in context.

First, In *United States v. Cordon*, the Court sentenced the defendant to two (2) months of probation, a $4,000 fine, and $500 in restitution. Mr. Cordon entered the Capitol through a broken window, walked into the Crypt of the Capitol building amongst a large crowd, then turned and exited through another broken window. He remained in the Capitol for approximately four (4) minutes and recorded a video while inside. 1:21-cr-00269-TNM-1 at ECF No. 37, 24.

Consider further the case *United States v. Bennett*, where the Government sought three months of home confinement after a guilty plea to parading. *See* 1:21-cr-227-JEB. Mr. Bennett was an admirer of the Proud Boys, was very active on social media planning and promoting the events of January 6, 2021, and live streamed while inside the Capitol for nearly 30 minutes, documenting much of the riotous behavior. Id. at ECF No. 24. The Government made clear that there was no evidence that Mr. Bennett committed any violence or destruction while inside. Ultimately, Judge Boasberg sentenced Mr. Bennett to twenty-four (24) months of probation, along with the $500 restitution and $10 special assessment.

Jennifer Parks was sentenced to twenty-four (24) months of probation and sixty (60) hours of community service, $500 restitution, and a $10 dollar special assessment following a plea of guilty to parading. *See United States v. Parks*, 1:21-cr-363 at ECF No. 31. Ms. Parks had entered the Capitol through a door that was already broken, and remained inside the Capitol taking pictures for approximately 15 minutes, until told to exit the building by a United States Capitol Police officer. *See Id.*, ECF No.21.

In *United States v. Rosa*, the Government sought a sentence of one (1) month of home confinement after a plea to parading. *See* 1:21-cr-68-TNM, ECF No. 66. Mr. Rosa posted on social media about the day's events and acknowledged hearing bangs and smelling pepper spray in the air –

13

an admission that the situation was escalating. He remained inside the Capitol for approximately 20 minutes, but there was no evidence he participated in any violence or destruction. *Id*. Ultimately, the Court sentenced Mr. Rosa to twelve (12) months of probation, along with $500 restitution and $10 special assessment. *Id*. at 79

In *United States v. Doyle*, this Court sentenced the defendant to two (2) months of probation and a $3,000 fine, $500 in restitution, and a $10 special assessment. Ms. Doyle entered the Capitol through a broken window, remained inside for 24 minutes, and appeared to be chanting and yelling in the direction of law enforcement. 1:21-cr-324-TNM at ECF Dckt. No. 27, 34.

Another example, this Court should consider the sentence imposed on Lori Vinson, who was sentenced to five years' probation and a fine of $5,000. *See United States v. Vinson*, No. 21-cr-355-RBW. Ms. Vinson entered the Capitol at 2:18 p.m., made a video of her time inside the building on her cell phone, was in the building for about 30 minutes, and told local news outlets a few days later "that she believed her actions were 'justified' and that she would 'do this all over again tomorrow.'" In the weeks that followed, she doubled-down on that position and made similar statements on Facebook and in other television interviews, as well as told multiple people through direct messages that "she would 'do it again.'"

Lastly, this Court has imposed non-incarceratory sentences for two individuals similar to Mr. Johnson. In *United States v. Nelson et al.*, 1:21-CR-00344-JDB, the Court granted probationary sentences to both defendants who were similarly convicted of 40 U.S.C. § 5104(e)(2)(G). In that case, the Court sentenced Abram Marfoski and Brandon Nelson, to probation. After the offense, they gloated to one another about their participation in the riot, and stayed in the Capitol building for over an hour.

Mr. Johnson's conduct is like the above cases and is deserving of similar treatment. Mr.

Johnson did not engage in violence. He was cooperative with law-enforcement when they interviewed him. He was interviewed twice by the FBI. He admitted his conduct in January of 2021, and in May in 2022. After he was formally charged, Mr. Johnson took responsibility for his conduct quickly. Although Mr. Johnson lacked contrition in his online posts immediately after the protest, Mr. Johnson's rhetoric was consistent with that of others who have been granted probation. Further, although he was amongst the first group of people to enter the Capitol building, he remained inside the building for a comparatively short amount of time. In sum, probation without any incarceration is a reasonable sentence that is consistent with other sentences of similarly situated defendants.

This case is unlike *United States v. Nathan Entrekin*, 1:21-CR-686-FYP, a January 6 defendant also convicted of 40 U.S.C. § 5104(e)(2)(G) for several reasons. Mr. Entrekin re-entered the Capitol *after* being forced out by police officers. This confrontation with police, and then a continued assault on the capitol distinguishes Mr. Entrekin from this case. Further, Mr. Entrekin had two prior convictions; for one conviction served a hundred- and five-day sentence. Mr. Entrekin was encouraging other rioters in their advance on the Capitol. Mr. Entrekin entered into Senator Merkley's office. Mr. Entrekin was sentenced to forty-five days; the Government recommended more than twice that amount.

Further, this case is mitigated when compared to *United States v. Dawn Bancroft*, 1:21-CR-125-EGS. There, the defendant recorded a video where she states that she "did [her] part" when she "broke into the Capitol," "got inside," and was "looking for Nancy to shoot her in the frickin' brain." This comment was referred to by the Government as "among the most graphic statements uttered by any rioter on Capitol grounds that day." *Id.*, Dckt. # 55, p. 14. Bancroft received a sixty-day sentence.

//

//

15

**VII – Probation Is a Reasonable Sentence.**

Mr. Johnson's sentence recommendation is not without an appropriate amount of punishment. The Supreme Court has observed that probation is itself a meaningful punishment. *Gall v. United States*, 552 U.S. 38, 48-49 (2007). Offenders are subject to standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))). Moreover, probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of crimes, and refrain from many activities that could present a risk of re-offense. Probation is a meaningful punishment that addresses concerns relating to public safety and assures that he remains on-track with his education and employment.

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). In similar cases, the government has argued that deterrence is an important aspect of the sentence imposed. Mr. Johnson offers the following observations in anticipation of the government's argument. Given Mr. Johnson's history and characteristics specific deterrence does not require a period of incarceration. As for deterrence and just punishment, a term of incarceration (rather than a term of probation) will have no more specific deterrent effect on him. Deterrence, both specific and general, has already been accomplished by this public prosecution. Mr. Johnson has been convicted of committing a crime; and this mark will remain on his record as he seeks employment and advancement for many

years; the actual criminal conviction is itself a strong punishment, which is why the government would not allow dispositions without adjudications in these cases.

Nor is additional specific deterrence merited here. Mr. Johnson's conduct was mitigated. And when he was contacted by the FBI, he cooperated with investigators, acknowledged his misconduct, and accepted responsibility. Although the Government characterizes his statements as misleading, Mr. Johnson has never denied that he was unlawfully present at the Capitol. His arrest, booking and appearance in court, his time of pretrial release, and his time on probation is more than is needed to make the point that his misconduct was criminal. For someone with such little prior contact with law enforcement, the arrest made a significant impression. Ultimately, Mr. Johnson is a different person today. He no longer has a large social media following. He has a stable job. And most importantly, he has his two children who he is raising. His two children have shifted his perspective and have helped him grow as a person.

**VIII – Prohibition on Marijuana as a Condition of Probation.**

Mr. Johnson respectfully requests that the Court decline to impose a probation condition that restricts his use of marijuana because it is a burden on his religious practice. Mr. Johnson is a Rastafarian and the use of Marijuana is a sacrament.

It is well recognized that the sentencing judge has broad discretion in setting probation conditions. *United States v. Lowe*, 654 F.2d 562, 567 (9th Cir. 1981). However, "[t]his discretion is not totally unbridled but is limited by the requirement that the terms and conditions of probation be primarily designed to meet the ends of rehabilitation and the protection of the public, and the recognition that the statutorily prescribed maximum sentence cannot be increased by the terms of probation." *United States v. Mitsubishi Int'l Corp.*, 677 F.2d 785, 787–88 (9th Cir. 1982) (citation omitted). Conditions of supervision must be individualized and based on the nature and

circumstances of the offense and the history and the characteristics of the defendant. *United States v. Weber*, 451 F.3d 552, 557 (9th Cir. 2006).

Courts that have addressed similar claims in the past have rejected it. In *Israel*, the Seventh Circuit rejected a Rastafarian's claim that he did not violate a condition of his supervised release because his sacramental use of marijuana was protected by RFRA. *United States v. Israel*, 317 F.3d 768 (7th Cir. 2003). Further, possession and use of marijuana are illegal under federal law. 21 U.S.C. § 844(a). The federal Controlled Substances Act prohibits possession of marijuana outside of government-approved research projects, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 489–90 (2001), and Congress prohibited all defendants from unlawfully possessing controlled substances during their terms of supervision. *United States v. Lafley*, 656 F.3d 936, 941 (9th Cir.2011) (citing 18 U.S.C. § 3583(d)).

Notwithstanding these authorities, Mr. Johnson requests this court permit him to use the sacrament of marijuana while on probation. The prohibition on marijuana consumption would burden his religious exercise. Under RFRA, a "person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). RFRA is only triggered when a sincerely held religious belief is substantially burdened by a governmental law or policy. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015). Here, the policy prohibiting Mr. Johnson from using a sacrament substantially burdens his religious practice.

If the religious adherent makes a prima facie RFRA showing, the burden shifts to the Government to show the law at issue furthers a compelling interest and is the least restrictive means of doing so. In *Bauer*, the Ninth Circuit impliedly found that prohibition of this sacrament was a substantial burden when it held that the prosecution of a Rastafarian for the personal possession and

use of marijuana gives rise to a valid, religious-exercise defense under the RFRA. *U.S. v. Bauer*, 84 F.3d 1549 (1996). Given Mr. Johnson's strong religious convictions and the Government's waning interest in marijuana prohibition, he asks that this Court grant an exemption to the mandatory prohibition on marijuana possession and consumption as it unduly burdens his religious exercise.

## IX – Conclusion

For the reasons set forth above, Mr. Johnson respectfully requests that this Court sentence him to a term of probation, with the condition that he complete 40 hours of community service.

HEATHER E. WILLIAMS
Federal Defender – ED CAL

Date: December 8, 2022

*/s/ Griffin Estes*
GRIFFIN ESTES
Assistant Federal Defender
Attorney for Defendant
THADDIS JOHNSON JR.

**CERTIFICATE OF SERVICE**

On this 8th day of December 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

Date: December 8, 2022

/s/ Griffin Estes
GRIFFIN ESTES
Assistant Federal Defender